# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **REALTIME DATA, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:16-CV-00089** |
| | § | **RWS-JDL** |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **DELL INC. and EMC CORPORATION,** | § | |
| | § | |
| | § | |
| *Defendants.* | § | **SEALED** |

## SEALED MEMORANDUM OPINION AND ORDER

Before the Court is Defendants EMC Corporation ("EMC") and Dell Inc.'s ("Dell") Joint Motion to Sever EMC and Stay the Claim Against Dell for a Specific Accused Product. (Doc. No. 49.) Plaintiff Realtime Data LLC ("Realtime") has filed an Opposition (Doc. No. 73), Defendants have filed a Reply (Doc. No. 86), and Realtime has filed a Sur-Reply (Doc. No. 89).

Also before the Court is Defendant EMC's Motion to Transfer Venue to the U.S. District Court for the Northern District of California. (Doc. No. 50.) Realtime has filed an Opposition (Doc. No. 72), EMC has filed a Reply (Doc. No. 87), and Realtime has filed a Sur-Reply (Doc. No. 90).

After consideration of the parties' arguments and for the reasons stated herein, the Court **DENIES** Defendants' Joint Motion to Sever EMC and Stay the Claim Against Dell for a Specific Accused Product (Doc. No. 49) and **DENIES** EMC's Motion to Transfer Venue to the Northern District of California (Doc. No. 50).

## I.      BACKGROUND

Realtime is a New York limited liability company with its principal place of business located at 116 Croton Lake Road, Katonah, New York 10536.  (Doc. No. 1, ¶ 1.)  Realtime also maintains offices in Tyler, Texas and Plano, Texas, where Realtime purports to keep substantially all of its documents relevant to this case.  (*Id.*; Doc. No. 72-2 ("Tashjian Decl."), ¶ 5.)

On February 26, 2016, Realtime sued Defendants for patent infringement.  (Doc. No. 1.)  On the same day, Realtime filed two additional actions alleging infringement of the same patents, both of which were also assigned to Judge Schroeder and referred to the undersigned.  *See Realtime Data LLC v. Hewlett Packard Enterprise Co.*, No. 6:16-cv-86 (E.D. Tex. Feb. 26, 2016); *Realtime Data LLC v. Savvis Comm'ns Corp.*, No. 6:16-cv-87 (E.D. Tex. Feb. 26, 2016).

In its Original Complaint, Realtime alleged that EMC and Dell have a "business alliance" where they "market joint products such as the Dell / EMC DD Series deduplication storage systems (including DD140, DD610, DD630, and DD670)."  (*Id.* at ¶ 6.)  Realtime also alleged that "[o]n information and belief, Defendant Dell will complete its acquisition of Defendant EMC later this year."  (*Id.*)  Realtime further alleged that Dell promotes EMC products together with Dell products and services based on ongoing contractual agreements between the parties.  (*Id.*)  Realtime alleged that various Dell products, EMC products, and the "joint" Dell/EMC DD Series products infringed its patents.  (*See generally*, *id.*)

Defendants moved to dismiss the Original Complaint (Doc. No.21) and Realtime filed a First Amended Complaint (Doc. No. 36).  EMC filed a second Motion to Dismiss on June 23, 2016 (Doc. No.39) and Defendants filed the instant motions on July 28, 2016 (Doc. Nos. 49, 50).  Soon after, Realtime filed a Second Amended Complaint.  (Doc. No. 58.)  The Second Amended

Complaint includes the same allegations about Dell and EMC's "business alliance" as the Original Complaint.  (Doc. No. 58, ¶ 4.)

Defendants filed their Answers to the Second Amended Complaint on August 30, 2016. (Doc. Nos. 76, 79.)  Dell and EMC admitted having contractual agreements and plans to merge, but denied "Realtime's characterizations of those agreements."  (Doc. No. 79, ¶ 4; Doc. No. 76, ¶ 4.)  Defendants also admitted that EMC sold "EMC Data Domain products to Dell which Dell has re-branded and sold as the Dell / EMC DD Series products."  (*Id.*)  On September 16, 2016, Dell and EMC completed their merger to become Dell Technologies.  (Doc. No. 89, Ex. 12-13.)

At the time of the Complaint, Dell was a Delaware Corporation with its principal place of business located in Round Rock, Texas.   (Doc. No. 76, ¶ 2.)   EMC was a Massachusetts Corporation with its principal place of business located in Hopkinton, Massachusetts.  (Doc. No. 79, ¶ 3.)  EMC alleges that its senior management and day-to-day operations relating to the DD Series products are located in its Santa Clara, California office.   (Doc. No. 50-3 ("Smails Transfer Decl."), ¶10.)   EMC alleges that "documents relating to the development, testing, operation, and functionality of the Data Domain Series technology and products are located in Santa Clara, California, but are available electronically."  (*Id.* at ¶12.)  EMC also "expects" that the "vast majority" of documents and witnesses relating to engineering, marketing, and sales of the DD Series products will be located in Santa Clara, California.  (*Id.* at ¶¶14-15.)  However, certain employees related to sales and marketing are also in Massachusetts.  (*Id.* at ¶15.)  EMC's other accused products also include documents and witnesses in California and Massachusetts, as well as in Israel.  (*See generally*, *id.*; *see also* Doc. No. 50-2 ("Goldstein Decl.").)

## II.   APPLICABLE LAW

### A.   Severance Under F.R.C.P. 21

Dell and EMC do not appear to allege improper joinder of the parties under 35 U.S.C. § 299.  *See* 35 U.S.C. § 299 ("accused infringer may be joined in one action . . . only if . . . any right to relieve is asserted against the parties jointly, severally, . . . arising out of the same transaction, occurrence or questions of fact common to all defendants . . .").  Instead, the parties focus their arguments on the Court's discretionary power to sever a party under Rule 21 of the Federal Rules of Civil Procedure.  FED. R. CIV. P. 21.  Rule 21 provides that "the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party." *Id.*  Pursuant to Rule 21, "district courts have the discretion to refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness."  *In re EMC Corp.*, 677 F.3d 1351, 1360 (Fed. Cir. 2012) (quoting *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010)); *see also In re Nintendo Co., Ltd.*, 544 F. App'x 934, 938 (Fed. Cir. Sept. 25, 2013) ("*Nintendo II*").

When faced with circumstances similar to those present in this case, Courts have evaluated three factors to determine whether they may exercise their discretion to sever a party: "(1) whether the remaining claims are peripheral to the severed claims; (2) whether adjudication of the severed claims would potentially dispose of the remaining claims; and (3) whether the § 1404(a) factors warrant transfer of the severed claims."  *Cellular Comm'ns Equip. LLC v. HTC Corp.*, Nos. 6:13-cv-507, 6:14-cv-251, 2015 WL 11118110, at *6 (E.D. Tex. Mar. 27, 2015); *Shifferaw v. Emson USA*, No. 2:09-cv-54, 2010 WL 1064380, at *1 (E.D. Tex. March 18, 2010).

### B.      Transfer Under 28 U.S.C. § 1404(a)

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  The goals of § 1404(a) are to prevent waste of time, energy, and money, and also to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Ultimately it is within a district court's sound discretion to transfer venue pursuant to 28 U.S.C. § 1404(a), but the court must exercise its discretion in light of the particular circumstances of the case.  *Hanby v. Shell Oil Co.*, 144 F. Supp. 2d 673, 676 (E.D. Tex. 2001); *Mohamed v. Mazda Corp.*, 90 F. Supp. 2d 757, 768 (E.D. Tex. 2000).  The party seeking transfer must show good cause for the transfer.  *In re Volkswagen of America, Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*").   To show good cause, the moving party must demonstrate the transferee venue is clearly more convenient.  *Id.*

When deciding whether to transfer venue, a district court balances the private interests of the parties and the public interests in the fair and efficient administration of justice.  The private interest factors the court considers are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.  *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*").  The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict laws or in the application of foreign law.  *Id.*

5

### C.      Stay in Light of Severance and Transfer

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936).  Courts analyze three factors in determining whether a stay is appropriate: "1) whether a stay will unduly prejudice or present clear tactical disadvantage to the nonmoving party, 2) whether a stay will simplify the issues in question and the trial of the case, and 3) whether discovery is complete and whether a trial date has been set." *BarTex Research, LLC v. FedEx Corp.*, 611 F. Supp. 2d 647, 649-50 (E.D. Tex. 2009).  Courts generally rely on their discretionary power to stay a case against a reseller or retailer in situations where an action against a "true defendant" manufacturer has been severed and transferred to another district. *See, e.g.*, *In re Nintendo of America*, 756 F.3d 1363, 1366 (Fed. Cir. 2014) ("*Nintendo III")*; *Shifferaw*, 20010 WL 1064380, at *6.

### III.   DISCUSSION

### A.      EMC and Dell's Motion to Sever

In their Motion to Sever, Defendants assert that the only basis for Realtime's joinder is the allegation that the Dell/EMC DD Series product is a "joint" product between the two companies.  (Doc. No. 49, at 1.)  Defendants argue that if the DD Series product claims against EMC are severed, the remaining claims against Dell with respect to that product are peripheral. (*Id.* at 4-5.)  Further, Defendants argue that adjudication of the DD Series product claim against EMC will likely dispose of that claim against Dell.  (*Id.* at 6.)  Realtime disputes each of these assertions.  (*See* Doc. No. 73.)

### 1.      Whether Remaining Claims Are Peripheral to the Severed Claims

Defendants contend that Dell was a "mere reseller" of DD Series products.  (Doc. No. 49, at 3.)   In a sworn affidavit submitted by Peter Smails, EMC's Vice President of Product Marketing, Smails states that EMC sold DD Series products to Dell pursuant to a contractual agreement.   (Doc. No. 49-3, ("Smails Severance Decl.") ¶ 5.)   Smails states that "Dell's involvement with the Data Domain Series technology and products has been limited to product marketing and sales, and Dell has not participated in product development."  (*Id.*)  Defendants also submit a sworn affidavit of Patrick Eric Cannell, a Director of Storage Product Management at Dell.  (Doc. No. 49-2, "Cannell Decl.").)   Cannell likewise states that Dell was a "mere reseller of the DD Series products, and had no involvement with EMC or Data Domain technology."  (*Id.* at ¶6.)  According to Cannell, "Dell does not have any technical information on the DD Series that it did not obtain from EMC."  (*Id.* at ¶7.)

In response to Defendants' arguments, Realtime submits that Dell's involvement with the DD Series product is "far from peripheral."  (Doc. No. 73, at 6.)   Realtime submits various pieces of evidence to support this argument, including LinkedIn profiles for Dell employees representing that the employees have experience with DD Series.  (*See, e.g.*, *Id.*, Ex. 3 (listing Dell employee James Negri as a Backup Solutions Senior Analyst supporting "Data Domain," among other products, from June 2006 to July 2011); *see also*, Ex. 2.)  Realtime also submits Dell brochures describing DD Series products, including "test results" for "lab tests" that Dell purportedly performed using DD Series products.  (*Id.*, Ex. 5 ("In ***our*** lab tests, using NetVault Backup with DD Boost reduced job runtime by 50% or more, on average." (emphasis added)).)  In a separate argument, Realtime notes that it has asserted claims against numerous other "purely Dell products" such that Dell is not simply a peripheral party to litigation.  (Doc. No. 73, at 5-6.)

Realtime also emphasizes that Dell and EMC's merger makes severance contrary to judicial economy.  (*Id.* at 8.)

In reply, Defendants argue that Realtime's evidence "fails to show that Dell was anything more than a distributor of the [DD Series] product."  (Doc. No. 86, at 3-4.)  Defendants argue that the Dell employee LinkedIn profiles show "merely" that the employees "use" or "support" DD Series products in addition to other third-party products.  (*Id.* at 3.)  Defendants do not address the Dell brochure indicating lab tests performed by Dell or discuss Realtime's other proffered Dell documents instructing users how to add DD Series products to a server.  (*See* Doc. No. 73, Exs. 5-6.)  Defendants argue that Dell's other accused products and the Dell-EMC merger should not be factored into the severance analysis.  (Doc. No. 86, at 2-3, 4-5.)

Even restricting the analysis of the first two severance factors to the DD Series products,[1] the Court finds that Defendants have not met their burden of showing that the claim against Dell is merely peripheral to the claim against EMC.  Defendants' evidentiary support for the argument that Dell is a "mere reseller" of DD Series products is two sworn affidavits—one from a Dell Data Storage Product Management Director and another from EMC's Vice President of Product Marketing.  (*See* Cannell Decl., Smails Severance Decl.)  Defendants do not submit the

---

[1] The Court does not address the question of whether it *is required to* exempt the "purely Dell" accused products from the severance analysis.  Defendants argue that pursuant to the Federal Circuit's unpublished *Nintendo* opinion, the Court may only consider the accused products that *led to* joinder under 35 U.S.C. § 299 when reviewing the severance factors.  *See Nintendo II*, 544 F. App'x at 940; (*see* Doc. No. 86, at 3.)  In *Nintendo II*, Nintendo and a number of retailers were sued for patent infringement for sales of a product manufactured by Nintendo.  *Nintendo II*, 544 F. App'x at 935.  When Nintendo sought severance and transfer of the claims against it to another district, the Plaintiff filed an amended complaint with additional infringement claims against the retailers for sales of accused products manufactured by third parties.  *Id.* at 936.  Plaintiff relied on Rule 18 to add the newly accused products to the suit.  *Id.*  The Federal Circuit found that the district court should have performed the severance and transfer analysis without considering the later-joined accused products: "[R]esolution of the motion to sever and transfer the case against Nintendo should not be driven by claims that were later added under Rule 18."  *Id.* at 940.  Here, the Original Complaint alleged infringement of both the DD Series products and the other "purely Dell" products.  (*See* Doc. No. 1.)  The parties have not cited any cases analyzing severance where there were additional accused products in the original complaint as opposed to an instance like *Nintendo* where the additional products were later added to the suit.  Given the facts of this case, however, it is unnecessary to determine the full contours of the *Nintendo* holding at this time.

Dell-EMC contract with respect to the DD Series products or any other evidence to further shed light on the Dell-EMC relationship.  On the other hand, Realtime has presented unrebutted evidence that Dell acted as more than a "mere reseller." (Doc. No. 73, Exs. 2-6.)  Defendants' attempt to diminish the significance of Dell employee LinkedIn profiles referencing DD Series product "support" is unpersuasive.  And Defendants do not even address the Dell brochure sharing "test results" for "lab tests" that Dell purportedly performed using DD Series products. (*See id.*, Ex. 5.)

While the full extent of the relationship between Dell and EMC with respect to DD series is unclear, there is simply not enough information at this time for the Court to characterize Dell as a "mere reseller" of EMC products.  At the very least, Dell took the time and effort to rebrand the DD Series products and publish its own marketing materials before selling those products to its customers.  (Smails Decl., ¶5.)  Realtime's evidence also indicates that Dell provided technical support instructing customers how to use the product rather than simply referring customers to EMC.  (*See* Doc. No. 73, Exs. 3, 6.)  Given the inconsistent evidence and argument presented by the parties, the court "declines to resolve the factual issues" surrounding the extent of Dell and EMC's relationship with respect to DD Series at this stage in the proceedings. *Cellular Comm'ns*, 2015 WL 11118110, at *8.

Defendants have not met their burden of showing that the remaining claims against Dell with respect to the DD Series products are merely peripheral to the claims against EMC.  This factor weighs against severance.

### 2. Whether Adjudication of the Severed Claims Would Potentially Dispose of the Remaining Claims

Defendants argue that a resolution of the claim against EMC "should obviate the need for further consideration of the claim for this product against Dell." (Doc. No. 49, at 5.) Defendants

allege that even if Realtime obtained a ruling of infringement against EMC, "the claim against Dell is still disposed of because Realtime cannot receive a double recovery for the same sale." (*Id.*)  Realtime argues that adjudication of the severed claims would not dispose of the remaining claims.  Realtime also notes that "Dell does not say that it agrees to be bound by any rulings regarding the DD Series product in any severed case.  Moreover, the claim against EMC regarding the DD Series product may not capture all of the damages to which Realtime is entitled." (Doc. No. 73, at 9.)

Given the current information before the Court, it is not clear that adjudication of the severed claims would dispose of the remaining claims against Dell with respect to DD Series products.  Realtime has asserted separate causes of action against Dell and EMC for induced infringement of method claims by the DD Series products.  (Doc. No. 58, ¶ 38-42; 74-78; 87-88; 95-96; 105-106; 113-114.)  Particularly given Dell's rebranding and individual marketing of the DD Series products, Realtime's indirect infringement claims will likely require adjudication with respect to both Dell and EMC.  The fact that Dell has not agreed to be bound by rulings regarding DD Series in a hypothetical severed case is also persuasive.  *See Cellular Comm'ns*, 2015 WL 11118110, at *9.  Severance creates the possibility of an unnecessarily duplicative lawsuit.  This factor thus also weighs against severance.

### 3.    Whether § 1404(a) Factors Warrant Transfer

EMC styles its arguments with respect to transfer as a separate Motion.  (*See* Doc. No. 50.)  Dell does not join the motion, and EMC's transfer arguments make no reference to Dell. (*See generally*, *id.*)  Realtime argues that "[i]f the Court does not sever EMC and Dell here, then transfer is of course unwarranted.  Indeed, Defendants do not even attempt to argue that transfer to California would be appropriate with Dell.  Nor could they.  Dell is a Texas-based company."

(Doc. No. 72, at 4.)  Because EMC appears to argue its Motion to Transfer only on the basis that Dell has been severed, the Court considers the Motion to Transfer only to the extent it lays out the 1404(a) factors, which represent the third prong of the severance analysis.

Realtime does not dispute that venue would be proper in the Northern District of California.  (*See also* Doc. No. 50, at 7.)  The Court thus proceeds to analyze the private and public interest factors under §1404(a).

### a)  Private Interest Factors

#### i)  *The relative ease of access to sources of proof*

This factor remains a part of the transfer analysis despite technological advances that have lightened the inconvenience of transporting large amounts of documents.  *Volkswagen II*, 545 F.3d at 316.  Courts analyze this factor in light of the distance evidence must be transported from its existing location to the trial venue.  *See id.*  The accused patent infringer is presumed to have the greater volume of documents relevant to the litigation such that more weight is placed on the location of the accused infringer's documents.  *See, e.g., in re Nintendo Co., Ltd.*, 589 F.3d 1194, 1199 (Fed. Cir. 2009) ("*Nintendo I*"); *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009); *Volkswagen II*, 545 F.3d at 314-15.  Documents that have been moved to a particular venue in anticipation of litigation are not considered in this analysis.  *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336-37 (Fed. Cir. 2009).

To meet its burden under this factor, EMC must identify its sources of proof with some specificity such that the Court may determine whether transfer to a particular district will increase the convenience of the parties.  *J2 Global Comm'ns, Inc. v. Proctus IP Solutions, Inc.*, No. 6:08-cv-211, 2009 WL 440525, at *2 (E.D. Tex. Feb. 20, 2009); *see also Invitrogen v. Gen. Elec. Co.*, No. 6:08-cv-113, 2009 WL 331889, at *3 (E.D. Tex. Feb. 9, 2009) (finding that

general statements that relevant documents were located in either England or New Jersey "fail to show that transfer would make access to sources of proof either more or less convenient for the parties.")

In its declaration, EMC states that its documents related to the "development, testing, operation, and functionality of the Data Domain Series technology and products are located in Santa Clara, California."  (Smails Transfer Decl., ¶12.)  EMC further states that the "vast majority" of its documents and witnesses related to engineering, marketing, and sales related to DD Series products are located in Santa Clara, California.  (*Id.* at ¶¶14-15.)  EMC acknowledges that it has local sales, professional sales, and customer sales support offices in Texas but emphasizes that "any financial data created by offices in Texas are backed up in and/or duplicative of documents maintained at EMC's sales headquarters in Hopkinton, Massachusetts."  (*Id.* at ¶21.)  With respect to EMC's other accused products, EMC merely states, for example, that "[n]one of EMC's engineering, marketing or manufacturing-related documents or witnesses for its VNX2 series technology or products are located in Texas."  (*Id.* at ¶20; *see also* Goldstein Decl., ¶10.)  EMC argues that any Realtime evidence in the district would have been transferred here in anticipation of litigation and is entitled to no weight.  (*Id.* at 9.)

Realtime's declaration states that "[s]ince 2009, substantially all of Realtime's documents relating to its intellectual property development and licensing were either physically located at Realtime's Tyler office or exist electronically and will be collected from Realtime's Tyler office."  (Tashjian Decl., ¶5.)  Realtime states that it "did not open its Tyler office for the purpose of filing lawsuits in Tyler or anywhere else in this District," but instead opened the office "to further its licensing efforts and to stage many of its physical prototypes and documents relating to its anticipated trial in the [earlier-filed] *Packeteer* action."  (*Id.* at ¶4.)  Realtime

12

argues, based on deposition testimony from EMC witnesses, that EMC has exaggerated the amount of witnesses and documents in California.  Specifically, Realtime asserts that certain employees involved with the DD Series products are located in Hopkinton, Massachusetts, where EMC is headquartered.  (Doc. No. 72, at 5 (citing Doc. No. 72, Ex. 4 ("Smails Dep.") at 17-19, 28-29 (testifying that Beth Phalen, the General Manager for the Data Domain products, and six of eight of Mr. Smails's subordinates are located in Massachusetts)).)  Realtime further notes that at least one of the accused products has a manufacturing facility in North Carolina, much closer to Texas than California.  (*Id.* at 6 (citing Doc. No. 72, Ex. 5 ("Goldstein Dep.") at 57.)  Realtime also emphasizes that EMC employs approximately 1,350 employees in the State of Texas.  (Doc. No. 72, at 6 (citing Smails Transfer Decl., ¶5).)

In reply, EMC contends that while it does have sales offices and employees in Texas, none of those offices or employees are located in the Eastern District.  (Doc. No. 87, at 1-2.)  EMC also argues that the presence of witnesses and evidence in Massachusetts is immaterial to the transfer analysis.  (*Id.* at 2-3 (citing *in re Toyota Motor Corp.*, 747 F.3d 1338, 1340-1341 (Fed. Cir. 2014)).)  In sur-reply, Realtime argues that EMC's Texas and Massachusetts presences are properly considered by the Court pursuant to the Fifth Circuit's 100-mile rule.  (Doc. No. 90, at 3 (citing *Volkswagen II*, 545 F.3d at 317).)  Specifically, Realtime notes that "it is more convenient for an Austin-based witness to travel to this District (*e.g.*, 200 miles) than to travel 1,500 miles to go to N.D. California."  (*Id.* at 3.)

The Court disagrees that Realtime's documentary evidence is entitled to no weight.  Realtime's declarations make clear that it housed relevant documents in its Tyler office well in advance of this litigation.  However, the location of Realtime's documents and witnesses is

afforded less weight than the location of EMC's documents and witnesses.  *See Genentech*, 566 F.3d at 1345 ("[T]he bulk of the relevant evidence usually comes from the accused infringer.") Further, as in previous cases, Realtime has failed to explain "how its physical devices, prototypes, source code, and demonstration software are relevant to [EMC's] alleged infringement of the asserted patents."  *Realtime Data LLC v. Teradata Operations, Inc.*, No. 6:15-cv-463, Doc. No. 225, at 5 (E.D. Tex. Jan. 20, 2016).

Meanwhile, EMC states that the "vast majority" of its documents and witnesses related to the engineering, marketing and sales of the DD Series products are located in California.  (*See* Smails Transfer Decl., ¶¶14-15.)  EMC includes its other two accused product series, VNX2 and XtremIO Storage Array, in its venue transfer assertions.  (Doc. No. 50, at 1.)  However, EMC does not provide the same specificity with respect to these products.  (*Id.* at ¶20; Goldstein Decl., ¶10 (simply asserting that certain categories of XtremIO and VNX2 documents are *not* located in Texas).)  EMC is asking the Court to transfer Realtime's *entire* case against EMC to the Northern District of California.  (*See* Doc. No. 50.)  But by omitting the location of documents related to XtremIO and VNX2—two of the three EMC accused products—EMC effectively asks the Court to speculate as to whether transfer would actually increase the ease of access to sources of proof for these products.

Likewise, while EMC has identified several individuals with relevant knowledge with respect to the DD Series products in the Northern District of California (*see* Smails Transfer Decl.), EMC has not indicated whether it is actually considering calling any of these individuals to testify at deposition or trial.  EMC identifies only a single witness with respect to its VNX2 products and two witnesses with respect to its XtremIO products compared to seven party and non-party witnesses with respect to DD Series products.  (Smails Transfer Decl., ¶19 ("Rich

Ruef, a senior architect involved in designing and developing VNX2's deduplication technology, resides in Santa Cruz, California."); Goldstein Decl., ¶¶3, 7; Smails Transfer Decl., ¶¶6, 11, 13, 16.)  EMC acknowledges that senior management and day-to-day operations for XtremIO are split between California and Israel, with other unnamed witnesses related to XtremIO's testing and development located primarily in Israel.  (Goldstein Decl., ¶¶5-7.)  The Court, again, is forced to speculate as to the actual relevance of each of EMC's witnesses as well as the proportion of relevant documents and witnesses actually present in the proposed forum, particularly with respect to EMC's VNX2 and XtremIO product lines.

EMC effectively asks the Court to restrict its analysis of this factor solely to documents and evidence in either the transferor or transferee forum based on the Federal Circuit's decision in *in re Toyota Motor Corp.*  747 F.3d at 1340-1341.  In *Toyota*, the Federal Circuit, citing *Genentech* and *Nintendo I*, stated "[t]he comparison between the transferor and transferee forums is not altered by the presence of other witnesses and documents in places outside both forums." *Id.* at 1340.  Even assuming that this is the proper analysis, EMC cannot meet its burden with respect to this factor by simply arguing evidence and witnesses related to VNX2 or XtremIO are *not* located in the Eastern District of Texas.  Likewise, cherry-picking individuals who happen to reside in or near the Northern District of California without describing whether they are likely to testify at trial does not allow the Court to properly weigh this factor because it gives the Court no context as to the likely number of witnesses actually expected to testify at trial for whom transfer would be clearly more convenient.  EMC's failure to identify the relevance and location of these other potential sources, even after Realtime raised the issue in its response, leaves the Court unable to weigh the relative ease of access to sources of proof in the transfer analysis.  *See Core*

*Wireless Licensing, S.A.R.L. v. Apple, Inc.*, No. 6:12-CV-100 LED-JDL, 2013 WL 682849, at *3 (E.D. Tex. Feb. 22, 2013).  The Court will thus treat this factor as neutral.


     ii)  *The availability of compulsory process*

   This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the transferee venue.  *See Volkswagen II*, 545 F.3d at 316.  The Court gives more weight to those specifically identified witnesses and affords less weight to vague assertions that witnesses are likely located in a particular forum.  *See Novelpoint Learning v. Leapfrog Enter.*, No. 6:10-cv-229, 2010 WL 5068146, at *6 (E.D. Tex. Dec. 6, 2010); *West Coast Trends, Inc. v. Ogio Int'l, Inc.*, No. 6:10-cv-688, 2011 WL 5117850, at *3 (E.D. Tex. Oct. 27, 2011).

   EMC identifies several non-employee witnesses it maintains reside in the "Santa Clara, California area" or "Northern California," including Robin Ren, who "is no longer with EMC, but resides in Northern California and is employed by Tesla" (Goldstein Decl., ¶7); and "[f]ormer employees of Data Domain Corporation" Brian Biles, Hugo Patterson, Beth White, and Nitin Garg (Smails Transfer Decl., ¶¶13, 16).

   Realtime argues that "EMC ignores a number of obviously relevant third-party witnesses located in or around this district" in its Motion.  (Doc. No. 72, at 8.)  Realtime identifies the LinkedIn pages of specific individuals "located in or around" the Eastern District to support its argument, including the LinkedIn pages of former EMC employee Glenn McGorty (Doc. No. 72, Ex. 9) and Texas-based Dell employees "knowledgeable about the technical operation and use of the accused products" (Doc. No. 72, Exs. 10-12).  Realtime notes that Dell declarant Patrick Eric Cannell, who stated that he is knowledgeable about EMC's Data Domain products, is also located in Texas.  (Cannell Decl., ¶2.)  Realtime also argues that some of EMC's biggest

customers, such as AT&T, are based in Texas and will have relevant knowledge relating to indirect infringement of the accused products.  (Doc. No. 72, at 8.)  Realtime argues that videotaped deposition is a reasonable alternative to calling witnesses at trial and thus decreases the weight of this factor.  (*Id.* at 7-8 (citing *Nexus Display Techs. LLC v. Dell, Inc.*, 2015 WL 5043069, at *4 (E.D. Tex. Aug. 25, 2015)).)

In reply, EMC argues that Realtime has failed to identify relevant third-party witnesses within the subpoena power of the Court.  (Doc. No. 87, at 3.)  EMC also argues that Realtime has failed to rebut the fact that there are a number of non-party witnesses in N.D. Cal., including the co-founder and chief architect of Data Domain.  (*Id.*)  In sur-reply, Realtime argues that it has identified a number of non-party witnesses within the Court's subpoena power, as Rule 45(c)(1)(B) extends to persons within the state, not just the district.  (Doc. No. 90, at 4.)

As an initial matter, when parties simply name third-party witnesses without identifying the nature of the testimony or asserting, on a good faith basis, whether a party intends to depose or call a witness to trial, analysis of this factor is a futile and pointless exercise.  At a minimum, in order to allow the Court to properly weigh this factor, litigants should identify the relevancy and materiality of the information such witnesses would provide and therefore the foreseeability that a particular witness would be deposed, called to trial, or both.  This identification enables the Court to give proper weight to each witness and analyze whether a particular witness is actually subject to a particular court's subpoena power.  This is particularly relevant given that subpoena power under Rule 45 is different depending on whether a witness is simply being deposed or also called to testify at trial.

Rule 45(c)(1) allows a court to issue a subpoena to non-party witnesses (A) to attend a trial, hearing or deposition within 100 miles of where the person resides, is employed, or

regularly transacts business, *or* (B) to attend trial within the state where the person resides, is employed or regularly transacts business *if the person would not incur substantial expense*. Even if Realtime had represented that it was actually planning to call its proffered Texas individuals to trial (or that it believed EMC would call them to trial), the Court cannot afford those witnesses any weight because Realtime has not explained whether the person would incur substantial expense from traveling to testify. Likewise, the Court cannot afford weight to the EMC individuals identified simply as residing in "Northern California." (*See* Goldstein Decl., ¶7; Smails Transfer Decl., ¶13.) Without knowing exactly where these third party individuals are located, the Court cannot say whether they reside, are employed, or regularly transact business within 100 miles of a Northern District of California courthouse.

While the Court recognizes Realtime's suggestion of playing videotaped depositions at trial may be a viable option under Rule 45, such a suggestion does not address the potential value to be added by having a witness testify in person at trial. The Court will not speculate as to whether the videotaped testimony of any of EMC's proposed witnesses would be sufficient if played at trial in comparison to live testimony. The Court also affords no weight to Realtime's arguments that prominent EMC customers are based in Texas and may have relevant knowledge. (Doc. No. 72, at 8.) The Court cannot base its conclusion on unidentified witnesses and vague assertions. *Novelpoint Learning*, 2010 WL 5068146, at *6.

Ultimately, there appear to be several potential third-party witnesses in California and several in Texas. On balance, EMC has identified potential witnesses who actually reside in the Northern District of California within 100 miles of the San Jose, San Francisco, and/or Oakland courthouses. On the other hand, Realtime has only identified individuals who reside within the state of Texas, but not within this district. The Court finds this factor weighs in favor of transfer.

iii)     *The cost of attendance for willing witnesses*

This factor gives broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *Volkswagen I*, 371 F.3d at 204. All potential material and relevant witnesses must be taken into account. *See id.*

EMC again cites to Mr. Smails's declaration to support its identification of willing witnesses.  (Doc. No. 50, at 10.)  Mr. Smails identifies Mahesh Kamat, Data Domain Chief Architect in Santa Clara, California (Smails Transfer Decl., ¶11); Shane Jackson, Chief Marketing Officer for Data Domain Technology in Santa Clara, California (*Id.* at ¶16); and Rich Ruef, Senior Architect for VNX2 Deduplicaiton Technology, in Santa Cruz, California (*Id.* at ¶19).  Mr. Smails is also located in Santa Clara, California.  (*Id.* at ¶2.)  EMC also submits the declaration of Mr. Goldstein, who resides in southern California but works part-time in EMC's Santa Clara office.  (Goldstein Decl., ¶2.)  Realtime argues that EMC's Motion intentionally omits EMC witnesses with relevant knowledge who are located in either Texas or Massachusetts.  (Doc. No. 72, at 9.)  As to its own willing witnesses, Realtime identifies Deepika Pagala, an electrical engineer employee located in Plano, Texas (Tashjian Decl., ¶7) and four potential party witnesses in New York.  (*Id.* at ¶¶2, 9.)  Realtime argues that if this case is transferred to the Northern District of California, its New York witnesses will be required to travel twice as far as they would if trial is held in this District.  (Doc. No. 72, at 11.)  EMC argues in Reply that Realtime has made no showing that any of EMC Texas sales employees "have any knowledge of the technical design or development of the accused products."  (Doc. No. 87, at 2.)  In Sur-

Reply, Realtime notes that "'technical design or development' are not the only activities relevant to this litigation." (Doc. No. 90, at 3.)

The fact that Realtime's New York witnesses have indicated that proceeding in this District will be more convenient for them is entitled to little weight. Because Realtime's named witnesses reside in New York, they "will be required to travel a significant distance no matter where they testify." *Genentech*, 566 F.3d at 1345. Accordingly, any added inconvenience to Realtime's witnesses of traveling to California, rather than to Texas, should not be overemphasized.

Realtime states that it has one employee who resides in this District and "assists in the development and licensing of Realtime's intellectual property portfolio relating to its data-compression inventions." (Tashjian Decl., ¶7.) Meanwhile, EMC has submitted at least five willing witnesses who work in Santa Clara, California and would be "unnecessarily inconvenienced by having to travel away from home to testify" in this district. (Smails Transfer Decl., ¶¶2, 11, 16, 19); *see also PersonalWeb Technolgies, LLC v. NEC Corp. of Am., Inc.*, No. 6:11-CV-655, 2013 WL 9600333, at *4 (E.D. Tex. Mar. 21, 2013). Realtime's opposition, however, raises the Court's concern that EMC is again cherry-picking witnesses in the Northern District of California and omitting relevant witnesses simply because they do not reside in the transferee district, including witnesses in the state of Texas and witnesses who work at EMC's headquarters in Massachusetts. This factor requires the Court to consider *all* potential material and relevant witnesses. *Volkswagen I*, 371 F.3d at 204. As with the first private interest factor, the Court is not convinced that EMC has provided the Court with all of the relevant information necessary to make a meaningful determination. Thus, rather than weighing strongly in favor of transfer, the Court will weigh this factor only slightly in favor of transfer based on EMC's five

proposed District of Northern California witnesses compared to Realtime's single proposed witness within this District.

### iv)   *Other practical problems*

Practical problems include those that are rationally based on judicial economy. The existence of duplicative suits involving the same or similar issues may create practical difficulties that will effect transfer. *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) (*"Volkswagen III"*). Further, "the existence of multiple lawsuits involving the same issues 'is a paramount consideration when determining whether a transfer is in the interest of justice.'" *In re Vicor Corp.*, 493 Fed.Appx. 59, 61 (Fed. Cir. 2012) (quoting *Volkswagen III*, 566 F.3d at 1351). The Court weighs this factor according to the situation that existed at the time the action was initiated. *See Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) (indicating motions to transfer venue are to be decided based on "the situation which existed when the suit was instituted."); *In re EMC Corp.*, 501 F. App'x 973, 975-76 (Fed. Cir. Jan. 29, 2013).

Rather than affirmatively arguing that this factor favors transfer, EMC's opening brief focuses on anticipating Realtime's arguments. EMC argues that Realtime's election to sue many different defendants in the Eastern District of Texas does not "create" practical economies. (Doc. No. 50, at 11.) EMC also argues "the fact that this Court has presided over past cases involving one of the asserted patents does not disfavor transfer." (*Id.* at 12.) Realtime argues that transferring EMC creates many practical problems. (Doc. No. 72, at 12.) Realtime notes that the Court would need to sever EMC from Dell, "even though there are overlapping products (*e.g.* Dell/EMC DD Series), and despite the fact that Dell is finalizing its deal to acquire EMC."

(*Id.*)  Realtime also emphasizes the district court's experience with the patents-in-suit from prior and pending litigation.  (*Id.*)

At the time the Complaint was filed, the Northern District of California had no experience with any of the patents-in-suit.[2]

On the other hand, at the time of the filing of this suit, there was at least some benefit to having the same judge handle related pretrial issues, including pretrial issues related to two other Realtime cases filed in this District the same day.  *In re EMC Corp.*, 501 F. App'x at 975-76; *see Realtime Data LLC v. Hewlett Packard Enterprise Co.*, No. 6:16-cv-86 (E.D. Tex. Feb. 26, 2016); *Realtime Data LLC v. Savvis Comm'ns Corp.*, No. 6:16-cv-87 (E.D. Tex. Feb. 26, 2016).

More importantly, though, based on the Court's analysis of the other severance factors, the Court finds that judicial economy would be served by having both Dell and EMC proceed before the same judge.  Even considering the parties' relationship prior to their merger, the Court does not have enough information to treat these parties and the claims against them as fully separate, particularly with respect to the DD Series products.  Transferring EMC would create a risk of inconsistent adjudication and consume additional judicial resources.  "[T]he existence of multiple lawsuits involving the same issues is a paramount consideration when determining whether a transfer is in the interest of justice."  *Volkswagen III*, 566 F.3d at 1351.  For these reasons, the Court concludes that this factor weighs against transfer.

---

[2] This Court has granted transfers to the Northern District of California with respect to three Realtime defendants. However, only two of those defendants were actually transferred to the Northern District of California; the third was voluntarily dismissed from the action prior to transfer.  *See Realtime Data, LLC v. Actian Corp.*, No. 6:15-cv-463, Doc. No. 243 (E.D. Tex. Feb. 22, 2016)(Dismissing Dropbox prior to transfer).  More importantly, the two transfers did not occur until after the above-captioned matter was filed.  *Realtime Data LLC d/b/a IXO v. Teradata Operations Inc.*, No. 3:16-cv-01836 (N.D. Cal. Apr. 8, 2016); *See Realtime Data, LLC d/b/a IXO v. Apple, Inc.*, No. 3:16-cv-02595 (N.D. Cal. May 13, 2016).  In keeping with the understanding that "[m]otions to transfer venue are to be decided based on 'the situation which existed when suit was instituted,'" the Court declines to consider any familiarity the Northern District of California may have later developed with respect to the patents-in-suit. *See in re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013).

**b)**     **Public Interest Factors**

    i)     *Local interest in having localized interests decided at home*

"Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I*, 371 F.3d at 206.  Generally, however, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *In re TS Tech*, 551 F.3d at 1321; *Volkswagen II*, 545 F.3d at 318 (disregarding local interest of citizens who used the widely sold product within the transferor venue in a products liability suit).  Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue. *Nintendo I*, 589 F.3d at 1198.

EMC argues that the Northern District of California has a strong local interest in the resolution of this litigation because the DD Series products were "designed, developed, tested, and marketed" in that district.   (Doc. No. 50, at 13.)  EMC further argues that Realtime "should not be able to thwart the venue laws merely by renting an office in Tyler without any employees in the District and without non-litigation work being done there." (*Id.*)  Realtime responds that EMC's argument should be rejected because California jurors would be biased towards EMC. (Doc. No. 72, at 14-15.)  Realtime notes that "Texas has just as much interest in this case as California, if not more." (*Id.* at 15.)  Realtime argues that EMC has about 1,350 employees in Texas and that Dallas, Texas is one of the top regions where EMC sells its products.  (*Id.*) Realtime further argues that it has "deep ties" to the district, emphasizing its two offices and its employee in Plano, Texas.  (*Id.*)

23

Ultimately, because EMC has identified several individuals whose work relates to the accused technology and who are located in the Northern District of California, the Court finds that the Northern District of California has a greater local interest in the outcome of the litigation.  *See In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009) ("[L]ocal interest in this case remains strong because the cause of action calls into question the work and reputation of several individuals residing in or near that district and who presumably conduct business in that community."); *Eon Corp. IP Holdings, LLC v. Sensus, USA Inc.*, No. 2:10-cv-448, 2012 WL 122562 (E.D. Tex. Jan. 9, 2012).  This District also has at least some local interest given that Realtime has two offices and one employee in this District, but on balance, this factor weighs slightly in favor of transfer.

ii)     *The Remaining Public Interest Factors*

Both parties assert that the remaining public interest factors are neutral.  (Doc. No. 50, at 13-14; Doc. No. 72, at 15.)  The Court agrees.  The first public interest factor, administrative issues related to congestion, is speculative in nature and cannot alone outweigh other factors.  *In re Genentech,* 566 F.3d 1338, 1347 (Fed. Cir. 2009).  With respect to the third and fourth factors, both courts are familiar with federal patent law and there are no conflicts to avoid.

**4.     Weighing the Transfer Factors and Severance Factors**

For the reasons explained above, relative ease of access to sources of proof is inconclusive and thus neutral; availability of compulsory process weighs in favor of transfer; cost of attendance for willing witnesses is largely inconclusive, but the Court will weigh it slightly in favor of transfer; practical problems, including judicial economy, weigh against transfer; local interest in having localized interests decided at home weighs slightly in favor of transfer; and the remaining public interest factors a neutral.  Ultimately, particularly given the

24

inconclusive outcome of some of the factors, EMC has not met its burden of showing that the Northern District of California is "clearly more convenient" under the transfer factors.

Even if EMC had met this high hurdle, the other two severance factors—whether the remaining claim against Dell is peripheral to the severed claims and whether adjudication of the severed claims would potentially dispose of the relevant claims—weigh against severing EMC from the case.  Ultimately, both severance and transfer fall within the sound discretion of the district court, and it is the movant's burden to show that severance and transfer would be the proper course of action.  In weighing the three severance factors, the Court finds that Defendants have failed to meet their burden here.  The Court thus **DENIES** EMC and Dell's Motion to Sever (Doc. No. 49) and therefore **DENIES AS MOOT** EMC's Motion to Transfer (Doc. No. 50).

### B.       EMC and Dell's Motion to Stay Litigation with Respect to Dell for a Specific Accused Product

Because the Court declines to sever EMC from this case or grant transfer to the Northern District of California, a stay with respect to Dell for the DD Series products is unwarranted.  The claims with respect to all other Dell and EMC accused products, as well as the claims against EMC with respect to the DD Series, will proceed forward in this case.  A stay would create a tactical disadvantage for Realtime and complicate rather than simplify the issues in question.  Further, while the case is in its early stages and discovery is not yet complete, a trial date has been set.  EMC and Dell's request for a stay with respect to a specific accused product is **DENIED**.

## IV.    CONCLUSION

For the reasons stated herein, Dell and EMC's Joint Motion to Sever EMC and Stay the Claim Against Dell for a Specific Accused Product (Doc. No. 49) is **DENIED**.  EMC's Motion to Transfer Venue to the Northern District of California (Doc. No. 50) is **DENIED AS MOOT**.

**So ORDERED and SIGNED this 3rd day of February, 2017.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE